# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 36656

STATE OF IDAHO,  )
  )  Boise, August 2010 Term
    Plaintiff-Respondent,  )
  )  2011 Opinion No. 24
v.  )
  )  Filed: March 16, 2011
ETHAN ALLEN WINDOM,  )
  )  Stephen Kenyon, Clerk
    Defendant-Appellant.  )

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Cheri C. Copsey, District Judge.

The judgment of conviction is <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant. Justin M. Curtis argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Jessica M. Lorello argued.

_____

HORTON, Justice

Ethan Windom appeals the district court's imposition of a determinate life sentence for the second-degree murder of his mother. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ethan Windom (Windom) lived alone with his divorced mother, Judith Windom (Judith). In late 2006, sixteen-year old Windom was diagnosed as suffering from anxiety and a major depressive disorder with no psychotic features. He was prescribed medications appropriate to those conditions. His counselor expressed concern that Windom may be a psychopath, and noted that if so, his condition was not treatable.

Windom was fascinated by serial killers, psychopaths, and schizophrenics. Beginning in the eighth grade, he modeled aspects of his daily life upon the habits of the protagonist in the movie *American Psycho*, carrying a briefcase to school, maintaining a specific hygiene routine, and using particular brands of hygiene products and luggage. He kept a day planner within which he wrote about "kill[ing] everyone" and "see[ing] how" human organs would taste. The

day planner contained sketched figures of naked women being tortured and killed in gruesome ways.

Windom had an aggressive relationship with his mother. He bullied her into buying him the expensive personal hygiene products and accessories he knew from *American Psycho*, and intimidated her into occupying their home's smallest bedroom. He dominated the remaining spaces in the home. He repeatedly told his friends that he wanted his mother dead. Windom's father, Judith's ex-husband, testified that on more than one occasion, she had expressed fear that Windom would kill her as she slept.

On the evening of January 24, 2007, Windom experienced a strong urge to kill. He took five times his normal dose of anti-anxiety medication. He considered seeking out "bums" to kill, but feared that his mother would stop him. Instead, Windom fashioned a club by attaching several weights to the end of a dumbbell. He collected two knives and took the club to Judith's bedroom. Windom placed his hand over his mother's mouth while she slept and began to beat her in the face with the club. When his arms tired from the weight, he took one of the knives and stabbed her repeatedly in the throat, chest, and abdomen. Eventually convinced that Judith was dead, Windom removed his hand from what he "thought was her mouth" and thrust the second knife into her exposed brain.

Windom then changed the home's answering machine message to relate that he and his mother had unexpectedly left town to deal with family issues. He called a friend and left her a voicemail stating that he would not meet her as was their normal morning routine. He then attempted to hitchhike to his father's house and eventually walked there. Upon arriving, Windom told his father that someone had attacked Judith and that she was dead. After Windom's father called the police, Windom was arrested and interrogated. Later that day, he confessed to the murder. He was charged as an adult with first-degree murder, eventually pleading guilty to an amended charge of second-degree murder.

While he was incarcerated, two mental health professionals assessed Windom. The first, Dr. Craig Beaver, a licensed psychologist, tentatively diagnosed him as suffering from schizophrenia, paranoid type. Dr. Beaver observed that Windom's symptoms appeared to be in partial remission as he was stabilized by the antipsychotic medication administered during his incarceration. Dr. Beaver opined that the murder occurred during a psychotic break. He noted that research demonstrates that individuals with similar psychiatric illnesses change and modify

as they age, and their risk for future violence diminishes "precipitously" after they turn thirty. Dr. Beaver expressed concern that Windom would present a threat of violent behavior if he were to stop regularly taking medication.

The second mental health professional, Dr. Michael Estess, is a psychiatrist. He first met Windom a few days after his arrest. At that time, Dr. Estess viewed Windom as "acutely psychotic." Dr. Estess viewed Windom as suffering from "an evolving paranoid, psychotic, delusional illness." Dr. Estess opined that the murder was "entirely a product of [Windom's] inappropriate, disorganized, illogical and psychotic process that was evolving above and beyond his control." Dr. Estess viewed Windom as having been "perfectly compliant" with all of his treatment recommendations. Finally, Dr. Estess opined that Windom was a "good candidate for treatment, both inpatient and outpatient" and expressed his belief that Windom "would be compliant with treatment recommendation" regardless of whether he were incarcerated.

The district court imposed a determinate life sentence, the maximum sentence permissible for second-degree murder. After the Idaho Court of Appeals affirmed the sentence, this Court granted Windom's petition for review.

## II. STANDARD OF REVIEW

Upon granting a petition for review of a Court of Appeals' decision, this Court gives serious consideration to the views of the Court of Appeals, but directly reviews the decision of the trial court. *Humberger v. Humberger*, 134 Idaho 39, 41, 995 P.2d 809, 811 (2000). Where the sentence imposed by a trial court is within statutory limits, "the appellant bears the burden of demonstrating that it is a clear abuse of discretion." *State v. Stevens*, 146 Idaho 139, 148, 191 P.3d 217, 226 (2008). When evaluating a claim that the trial court has abused its discretion, the sequence of our inquiry is first, whether the trial court correctly perceived the issue as one of discretion; second, whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and finally, whether the trial court reached its decision by an exercise of reason. *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

In order to prevail on a claim that a sentence represents an abuse of discretion, "the defendant must show in light of the governing criteria, [that the] sentence was excessive under any reasonable view of the facts." *State v. Charboneau* (*Charboneau II*), 124 Idaho 497, 499, 861 P.2d 67, 69 (1993) (quoting *State v. Broadhead*, 120 Idaho 141, 145, 814 P.2d 401, 405

(1991), *overruled on other grounds by State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992)). Thus, where reasonable minds might differ, the discretion vested in the trial court will be respected, and this Court will not supplant the views of the trial court with its own. *Broadhead*, 120 Idaho at 145, 814 P.2d at 405. Thus, in order to prevail, the appellant must establish that, under any reasonable view of the facts, the sentence was excessive considering the objectives of criminal punishment: (1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrongdoing. *State v. Stover*, 140 Idaho 927, 933, 104 P.3d 969, 975 (2005).

### III. ANALYSIS

Although Windom's appeal has been framed as a claim that the district court abused its discretion by imposing a fixed life sentence, careful review of his claim reveals that there is a second distinct issue relating to the legal standard governing imposition of fixed life sentences, specifically, whether a determinate life sentence may be imposed based solely upon the nature of the offense. As part of his argument that the sentence was an abuse of discretion, Windom asserts that the district court's sentence reflected an improper "judicial hedge against uncertainty." We address the question of whether a determinate life sentence may be imposed solely because of the egregiousness of the crime before turning our attention to the claim that the sentence was an impermissible hedge against uncertainty and the broader question of whether Windom's sentence represented an abuse of the district court's discretion.

**A. The district court may impose a determinate life sentence based solely upon the nature and gravity of the offense.**

On review, Windom suggests that this Court has not held, expressly or impliedly, that the nature of the offense standing alone, can support a determinate life sentence. We disagree. This Court has stated: "To impose a fixed life sentence 'requires a high degree of certainty that the perpetrator could never be safely released back into society *or that the nature of the offense requires that the individual spend the rest of his life behind bars*.'" *Stevens*, 146 Idaho at 149, 191 P.3d at 227 (emphasis added) (quoting *State v. Cross*, 132 Idaho 667, 672, 978 P.2d 227, 232 (1999)).

In *State v. Jackson*, 130 Idaho 293, 294, 939 P.2d 1372, 1373 (1997), this Court quoted the following language from the Idaho Court of Appeals with approval: "a fixed life sentence may be deemed reasonable if the offense is so egregious that it demands an exceptionally severe

measure of retribution and deterrence . . . ."  *Id*. at 294, 939 P.2d at 1373 (quoting *State v. Eubank*, 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct. App. 1988)).

In *State v. Cannady*, 137 Idaho 67, 73, 44 P.3d 1122, 1128 (2002), Justice Eismann wrote:  "When reviewing a fixed life sentence, the primary factors considered are the gravity of the offense and/or the need to protect society from the defendant."  In support of this statement, he cited to our earlier decision in *State v. Enno*, 119 Idaho 392, 807 P.2d 610 (1991).  This is significant because of the following statement in *Enno*:

> Although the sentence is a fixed life sentence with no possibility of parole, we find no abuse in the trial court's decision. Considering the heinous and cruel nature of the crime and that capital punishment was available to the trial court as an alternative based on the aggravating circumstances that were found, the trial court's decision is reasonable and within the maximum statutory limits allowed. Therefore, we affirm.

*Id*. at 409, 807 P.2d at 627.  Today we reiterate that, in appropriate cases, a district court may impose a determinate life sentence based upon the egregiousness of the crime.

**B. The district court did not abuse its discretion by sentencing Windom to serve a determinate life sentence.**

As a prelude to its lengthy sentencing remarks, the district court explicitly noted that it was exercising its sentencing discretion, stating:

> I have considered the nature of the offense.  I have considered the mental health issues.  I have considered mitigating and aggravating factors.  I have considered in mitigation, for example, the relative youth.  I have considered the fact that he does not have a long criminal record.  And I have to say it is the most difficult case I have ever had.  Ever.  It will haunt me forever.  Not just the pictures of the crime scene and what you did to your mom, but the entirety of the case.
>
> It is particularly difficult in this case because, as [the prosecutor] pointed out, I am presented with four different mental health diagnoses in the presentence report, or four different mental health professionals who have had contact with Mr. Windom at various times who have come to either a different diagnosis or a different prognosis.

The court then conducted an extended examination of the evidence relating to Windom's mental health including the differing diagnoses reached by the mental health professionals who worked with Windom prior to the murder and those who saw him later, the circumstances of the murder and Windom's behavior following the crime, including the manner in which he

conducted himself during the interviews with law enforcement officers and the content of his statements to investigating officers. The district court concluded:

> I don't know which mental health professional has it right. But I tend to agree with [the prosecutor], assuming that Dr. Beaver and Dr. Estess are correct and Mr. Windom is a paranoid schizophrenic, as Dr. Beaver indicated, the safety of society requires a couple [of] things. If Mr. Windom is let out, the safety of society, according to Dr. Beaver, requires that first he be treated by a mental health professional who really has it right and we can have no assurances of that. The second thing is that he actually takes his medications and that they actually work and that he doesn't play with his medications. And I don't know that I'm willing to trust that.
>
> My primary concern in a sentencing like this is protection of society. Mental health professionals cannot guarantee that Ethan Windom will be compliant or his medications will work or that he will be under proper treatment. We know in jail he has continued to titrate his medications. We know that he was not compliant before he entered incarceration. We know that he is still isolated from others. We know that he has continued on occasion to have bad thoughts even while in jail. We know that the only reason – we know that he is compliant because his medications are being injected. I cannot gamble that Ethan Windom will be compliant or that he will receive the proper care or that the medications will continue to work against some potential victim. Society deserves better than that.
>
> Fixed life is – it is one of the harshest sentences that we can hand down and it's reserved only for those offenses that are so egregious that it demands an exceptionally high measure of retribution, or that the evidence indicates that the offender cannot successfully be monitored in society to reduce the risk to those who come in contact with him and that imprisonment until death is the only way to insure that we are protecting society. In my view that is the case here.
>
> . . . [This murder] is so brutal and so heinous that I believe that a fixed life sentence is appropriate. I do not do that lightly. I have only on one other occasion given fixed life and it was for these similar reasons.

From these comments, it is evident that the district court was conscious of our earlier decisions holding that a fixed life sentence may be appropriate both when there is a high degree of certainty that the defendant can never be released safely into society and when the nature of the offense warrants such punishment. It is equally evident that the district court believed that both circumstances existed in this case. Windom asserts that the sentence imposed by the district court was an impermissible "judicial hedge against uncertainty" and argues that the district court abused its discretion, noting his expressed remorse for his crime, his youth, his rehabilitative potential and the evidence that his mental illness resulted in the murder. The State responds that the trial court properly considered each of the sentencing factors and reasonable minds may

differ as to its conclusion that a determinate life sentence was warranted.  Thus, the State concludes that the sentence cannot be deemed to represent an abuse of discretion.

**1. The sentence imposed by the district court did not represent an impermissible judicial hedge against uncertainty.**

This Court has recognized the effect of a determinate life sentence:  "Absent an executive commutation (an event which the judiciary can neither predict nor assume), a defendant given a fixed life sentence will be imprisoned until he [or she] dies."  *Eubank*, 114 Idaho at 637, 759 P.2d at 928.  Thus, after receiving such a sentence, the defendant will never have the opportunity to demonstrate good behavior, successful rehabilitation or other mitigating factors that may persuade the parole commission that the defendant may be safely released into the community. These considerations led this Court to employ a standard unique to fixed life sentences and, in so doing, we adopted the Court of Appeals' statement that "a fixed life sentence should not be regarded as a judicial hedge against uncertainty. To the contrary, a fixed life term . . . should be regarded as a sentence requiring a high degree of certainty—certainty that the nature of the crime demands incarceration until the perpetrator dies in prison, or certainty that the perpetrator never, at any time in his life, could be safely released."  *Jackson*, 130 Idaho at 294-95, 939 P.2d at 1373-74 (quoting *Eubank*, 114 Idaho at 638, 759 P.2d at 929).  Focusing on this language, Windom and the dissent argue that the district court's sentencing comments demonstrate that the sentence imposed reflects this impermissible "judicial hedge against uncertainty."

In *Jackson*, 130 Idaho at 294, 939 P.2d at 1373, this Court quoted a portion of the following statement from *Eubank* regarding the certainty required before imposing a fixed life sentence:

> Unfortunately, in making these determinations, a judge has complete information only in regard to retribution and deterrence, which are based on the nature of the offense. The character of the offender is not completely known because it may evolve over time. The judge must attempt to predict the defendant's future response to rehabilitative programs and the degree of risk he might pose to society if eventually released.

114 Idaho at 638, 759 P.2d at 929.

In this case, although the trial court had evidence before it including the opinions of two well-regarded mental health professionals regarding Windom's rehabilitative potential, it was the judge who bore the heavy burden of evaluating whether Windom would actually comply with rehabilitative programming and whether such programming would reduce his risk of future

violent behavior to an acceptable level.[1]  Although Windom and the dissent rely heavily on these opinions, the trial court engaged in a lengthy discussion of other evidence casting doubt that Windom possessed the rehabilitative potential reflected in the opinions advanced by Drs. Beaver and Estess.

The district court's comments reflect that it was not wholly persuaded of the accuracy of their shared diagnosis of schizophrenia, paranoid type.  The trial court discussed the differing diagnoses of Windom's earlier treating mental health professionals and the "tentative" diagnosis advanced by Dr. Beaver.

When considering the opinions that Windom's crime was the product of a psychotic break, the trial court considered the differing diagnoses of Windom's earlier treating mental health professionals as well as the evidence that Windom had planned and looked forward to the murder of his mother.  For months preceding the murder, he had intimidated and bullied her, forcing her to move into the smallest bedroom while he dominated the other spaces in their home.  He drew in his day planner graphic images of tortured women.  He told friends and even his brother that he despised his mother and that he wanted her dead.  Windom was so brazen that even his mother – his eventual victim – told Windom's father that she feared he might kill her while she slept.  The trial court cited evidence suggesting that Windom had studied the symptoms of mental illness and believed he could use them as a guise if he was ever in trouble with the law.  During his interviews with police, he mentioned that he had researched the symptoms of schizophrenia, and when pressed by an officer about whether "another part of Ethan" killed his mother, he laughingly replied that "MPD, multiple personality disorder, don't work."  Additionally, it appeared that Windom modeled some of his conduct prior to and after the murder in the likeness of the serial-killer protagonist from a movie called *American Psycho*. Based upon the district court's sentencing comments, it is evident that the court did not reject the possibility that Windom believed that he could mimic the brutal murders committed by the *American Psycho* protagonist and evade punishment by simulating a mental illness.  The court also noted that Windom's logic, responsiveness, and demeanor during the several interviews in

---

[1]   We do not share the dissent's view that the potential future action of parole authorities ought to be considered in the analysis of the propriety of a fixed life sentence imposed in the exercise of judicial discretion.  The Legislature has conferred the power and responsibility to impose determinate sentences upon the judiciary, including determinate life sentences.

the hours following the murder were suggestive that Windom may not have been actively psychotic.

The trial court further noted that even if Windom did suffer from a treatable mental health condition, both expert opinion and the course of Windom's treatment indicated that the condition of his illness and his treatment regime would require meticulous oversight. During incarceration, Windom's medication regime required titration, or monitoring of its efficacy and appropriate adjustment, several times. The Court noted evidence in the record that Windom was resistant to recommendations of Dr. Estess and others that he integrate with other juveniles and "go out into the yard and exercise" so that they could evaluate his behavior. The district court observed that before the murder, Windom had abused medications prescribed to treat his mental health by adjusting dosages and combining them with other substances. Although defense counsel pointed out that Windom had been compliant with his pharmacological regime while incarcerated, the court did not consider this to be a strong indication of his future compliance with the requirements imposed by mental health professionals. Rather, the district court pointed out that Windom's compliance was merely the passive receipt of medication by way of injection.

The task of sentencing is a difficult one. When evaluating the defendant's prospects for rehabilitation, trial judges are asked to make a probabilistic determination of a human being's likely future behavior. The reality is that a sentencing judge will never possess sufficient information about the defendant's character, life circumstances and past behavior so as to project future behavior with unerring accuracy. To the contrary, the factual determination of the defendant's probability of re-offense will always be based upon limited data. This extraordinarily difficult task is made more difficult because it is merely one factor to be considered by the sentencing judge – and a subordinate consideration at that. *State v. Moore*, 78 Idaho 359, 363, 304 P.2d 1101, 1103 (1956) ("Rehabilitation is not the controlling consideration . . . . The primary consideration is, and presumptively always will be, the good order and protection of society.").

Sentencing is less a science than an art. Judges face a different uncertainty principle than physicists: they must make a factual finding of the probability of future criminal behavior based upon limited data. In so doing, they draw upon their accumulated experience. It is precisely because of the difficulty of fashioning an objectively appropriate sentence that this Court has adopted a deferential standard of review of sentencing decisions. In this case, Windom

essentially asks this Court to re-weigh the evidence presented to the district court and reach a different conclusion as to his prospects for rehabilitation. It is evident that the district court did not believe that it was appropriate to abdicate its responsibility to conduct its own assessment of Windom's mental condition based upon the evidence before it and to accept, without reservation, the opinions of two doctors who offered promises of Windom's complete rehabilitation. If we were acting as sentencing judges, we may well have done as the dissent suggests, and placed greater weight on the opinions of Dr. Beaver and Estess than did the district court. However, our role is not to reweigh the evidence considered by the district court; our role is to determine whether reasonable minds could reach the same conclusion as did the district court. Applying this standard, we can find no error in the district court's finding that Windom represented an unreasonable risk of future dangerous behavior.[2]

### 2. In view of the nature of the offense, we can find no error in the district court's conclusion that the nature of the offense warranted a determinate life sentence.

As discussed in Part III(A) of this opinion, we continue to adhere to our earlier statements that the nature and gravity of the underlying offense may, standing alone, be sufficient to justify a determinate life sentence. The language from *Eubank* adopted by this Court in *Jackson*, 130 Idaho at 294, 939 P.2d at 1373, makes clear an important point: The considerations of societal retribution and general deterrence are not decided on the basis of the unique characteristics of the *offender*; rather these considerations are decided upon the characteristics of the *offense*.[3] *See Eubank*, 114 Idaho at 638, 759 P.2d at 929 ("a judge has complete information only in regard to retribution and deterrence, which are based on the nature of the offense."). In contrast, considerations of the defendant's prospects for rehabilitation, the correlated consideration of societal protection and specific deterrence are to be determined by the characteristics of the

---

[2] The dissent relies heavily upon *Graham v. Florida*, ___ U.S. ___, 130 S.Ct. 2011 (2010) and *Roper v. Simmons*, 543 U.S. 551 (2005) in support of the conclusion that the district court abused its discretion. We believe this reliance to be misplaced inasmuch as both decisions rested upon the Eighth Amendment. Indeed, when considering the sentence imposed upon a defendant who was under 18 at the time of his crime, *Graham* expressly recognized that "[t]here is a line 'between homicide and other serious violent offenses against the individual.'" 130 S.Ct. at 2027 (quoting *Kennedy v. Louisiana,* 554 U.S. 407, 438, 128 S.Ct. 2641, 2660 (2008)). In view of this clear line of demarcation, it is neither necessary nor appropriate to confuse our well-established standard of review of a trial court's sentencing decision by selective application of statements found in decisions defining the scope of Eighth Amendment protections.

[3] For the reasons set forth in footnote 2, *supra*, we find the dissent's reliance upon cases considering Eighth Amendment issues in the context of capital litigation to be misplaced.

offender. In this case, the trial court discussed the brutality of the murder when it considered the egregiousness of the offense. Windom viciously beat his sleeping mother in the head with the club that he had fashioned for that purpose, until he no longer could determine whether his hand covered her mouth. Responding officers found Judith's face to be unrecognizable. Windom then stabbed his mother repeatedly, deliberately attempting to stab her in the heart and the lungs before slitting her throat. He then deliberately left a knife in her exposed brain. The ferocity of the attack was such that only one of Judith's arms could be exposed for viewing at her funeral. The circumstances of this offense are such that we cannot find that the district court erred in its conclusion that Windom's offense was "so brutal and so heinous" as to warrant a fixed life sentence.

### 3. Windom has failed to show that the district court abused its discretion by imposing a fixed life sentence.

The preceding discussion may suggest that the district court's sentence was purely the product of considerations of Windom's prospects for rehabilitation and the nature of the crime he committed. This is not the case. Rather, the structure of this opinion reflects the issues presented on appeal and the reasoning advanced by the dissent. In our view, the district court's sentencing comments reflect: (1) an understanding of the discretionary decision before it; (2) recognition of the boundaries of its discretion; (3) recognition and application of the governing legal standards; and (4) the reasoning by which the district court reached its decision. As indicated in our statement of the standard of review, we examine the discretionary actions of a trial court in order to determine whether these requirements have been satisfied.

Windom claims that the district court abused its discretion by applying an erroneous legal standard. For the reasons set forth in Parts III(A) and III(B)(1), *supra*, we find this claim to be without merit. Distilled to its essence, the dissent believes that the trial court should have placed greater weight upon Windom's age, mental health issues and other mitigating factors. Our standard of review does not require (nor indeed, does it permit) us to conduct our own evaluation of the weight to be given each of the sentencing considerations (societal protection, general and specific deterrence, defendant's prospects for rehabilitation and societal retribution) in order to determine whether we agree with the district court's conclusion. Although reasonable minds may differ as to the "rightness" of the district court's factual conclusions as to Windom's

prospects for rehabilitation and whether the nature of his crime warrants fixed life imprisonment, it is manifest that the district court's sentence was the product of reason.

In short, our task is not to determine whether we agree with the sentence imposed; rather, our duty is to determine whether Windom has demonstrated that the district court's imposition of sentence constituted an abuse of its discretion under the well-established standards of review governing such decisions. We conclude that Windom has failed to do so.

## IV. CONCLUSION

We affirm the district court's judgment of conviction imposing a determinate life sentence for murder in the second-degree.

Chief Justice EISMANN and Justices BURDICK and J. JONES **CONCUR**.

Justice W. JONES, dissenting:

The Idaho Supreme Court today holds that a child with a serious mental illness can receive the maximum criminal penalty available to punish a healthy adult, even if the child must spend a lifetime behind bars without a chance for parole. For the following reasons, I respectfully dissent.

**A.** **The District Court Abused Its Discretion by Using the Wrong Legal Standard to Impose a Fixed-Life Sentence on Ethan**

Regarding Ethan's prospects for being rehabilitated, the district court abused its discretion in two ways. First, it applied the wrong legal standard when it cited its uncertainty over whether Ethan could be rehabilitated as a justification for the fixed-life sentence. Second, it did not exercise reason when it ignored overwhelming medical evidence that Ethan could someday be safely released into society.

*1.* *The District Court Applied an Incorrect Legal Standard by Using a Life Sentence as a Hedge Against Uncertainty*

At sentencing, the district court justified the fixed-life term by stating that Ethan will always need psychiatric attention, but that it is not certain he will be compliant with treatment.

Of course, no court can ever be absolutely certain or guarantee that someone will not re-offend, but a fixed-life sentence "should not be regarded as a judicial hedge against uncertainty." *State v. Cross*, 132 Idaho 667, 672, 978 P.2d 227, 232 (1999). The proper standard to apply in imposing a life sentence without possibility of parole was spelled out in *State v. Jackson*, 130

- 12 -

Idaho 293, 939 P.2d 1372 (1997). "[A] fixed life term, with its rigid preclusion of parole or good time, should be regarded as a sentence requiring a high degree of certainty . . . that the perpetrator never, at any time in his life, could be safely released." *Id.* at 294–95, 939 P.2d at 1373–74 (quoting *State v. Eubank*, 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct. App. 1988)). The district court applied the wrong legal standard by requiring Ethan to show a high degree of certainty that he *could* be rehabilitated someday. The district court instead should have required the State to show a high degree of certainty that Ethan *could not* be rehabilitated someday. That Ethan's doctors cannot guarantee his eventual rehabilitation is not enough to justify a fixed-life sentence.

The Majority asserts that the district court correctly recognized this legal standard, but I respectfully disagree. The Majority itself cites a lengthy excerpt in which, over and over again, the district court expressed uncertainty over Ethan's rehabilitative potential. Indeed, throughout its ruling, the court repeatedly indicated that it was imposing a life sentence because it was unsure about whether Ethan would continue to comply with treatment if released from prison decades from now. The court stated, "I don't have a clear path," and that "[m]ental health professionals cannot guarantee that Ethan Windom will be compliant or his medications will work or that he will be under proper treatment." The district court also asserted that "the safety of society . . . requires that first he be treated by a mental health professional who really has it right and we can have no assurances of that. The second thing is that he actually takes his medications and that they actually work and that he doesn't play with his medications. And I don't know that I'm willing to trust that." The court went on to say, "I cannot gamble that Ethan Windom will be compliant or that he will receive the proper care." These comments, combined with the overall tone of the district court's ruling, demonstrate that the court was resolving uncertainties about Ethan's rehabilitative potential against him, while the correct standard is to focus on whether the State proved he *cannot* be rehabilitated.

Because the district court applied an incorrect legal standard, it abused its discretion. *See State v. Byington*, 132 Idaho 589, 592, 977 P.2d 203, 206 (1999) (holding that the district court must apply the correct legal standard). A court sending a mentally ill child to prison for the rest of his life without a chance at parole should be more certain of its decision.

> 2. *Because It Applied an Incorrect Legal Standard, the District Court Did Not Exercise Reason in Concluding That Ethan Could Never Be Rehabilitated*

By failing to follow the correct legal standard, the district court unreasonably ignored a staggering body of evidence showing that Ethan is a good candidate for rehabilitation. Applying our well-settled law regarding fixed life sentences, the court had to find that Ethan so utterly lacks rehabilitative potential that only a lifetime spent in prison can reasonably protect society. *Jackson*, 130 Idaho at 294, 939 P.2d at 1373. Finding that a mentally ill juvenile defendant can *never* be rehabilitated is much more difficult than making such a finding as to a fully functioning adult. Since children continue to mature and develop as they age, "their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." *Graham v. Florida*, --- U.S. ---, 130 S. Ct. 2011, 2026 (2010) (quoting *Roper v. Simmons*, 543 U.S. 551, 570, 125 S. Ct. 1183, 1195 (2005)). There is a greater likelihood that a child's criminal character can be reformed. *Id.* at ---, 130 S. Ct. at 2026–27. Moreover, according to Dr. Beaver's report in this case, individuals with serious mental illness tend to become less aggressive as they age, especially as they enter their thirties.

The district court unreasonably held that Ethan could never be rehabilitated, especially in light of how difficult it is to predict a juvenile's potential for reform. First, Ethan accepted responsibility for his actions. He pled guilty to second-degree murder. At sentencing, he acknowledged that he was mentally ill, that he needed treatment, that he was accountable for the murder, and that he was sorry for what he had done.

Second, the evidence is overwhelming that Ethan could be safely rehabilitated someday in the future. Shortly after his arrest, Ethan was placed on a permanent regimen of antipsychotic medications. Ethan's social worker in jail observed a marked improvement in Ethan's symptoms over the following months and noted that, after a short time, Ethan began reporting problems or requesting changes in his treatment when necessary.

After being arrested, Ethan was examined by Dr. Michael E. Estess and Dr. Craig W. Beaver. Dr. Estess personally treated Ethan and, as the in-house psychiatrist at the Ada County Jail, was disinterested in the outcome of Ethan's sentence. Similarly, there is no reason to believe that Dr. Beaver, a psychologist who was initially chosen to evaluate Ethan's competency to stand trial, would be biased in any way. Both Dr. Estess and Dr. Beaver stated that Ethan would be a good candidate for rehabilitation because he responded well to antipsychotic medication, was compliant with his treatment regimen, and solicited additional care when necessary. Dr. Beaver wrote:

- 14 -

If at some point Ethan Windom is given an opportunity to return to the community and is compliant in his mental health treatment, he does have a very good rehabilitation potential. He has average intelligence, extensive family support, and does not have any significant drug or alcohol abuse issues. I do not see evidence yet of any significant underlying personality disorders which would interfere with appropriate adjustment, which includes mental health care, if he were to transition back into the community at some point in the distant future.

Dr. Estess wholly agreed, opining that Ethan "would be compliant with treatment recommendations whether incarcerated or whether he was an outpatient in a more liberal set of social circumstances," and even recommended parole or probation "at any point in time."

The State contends there is a high degree of certainty that Ethan will never be rehabilitated. It notes that, prior to sentencing, Dr. Estess was still adjusting Ethan's medication to ensure Ethan had no residual symptoms. The State also asserts that Ethan resisted going outside for exercise or integrating with other juveniles while in jail. These issues, however, are not a reasonable basis on which to conclude that Ethan will *never* be rehabilitated for the rest of his life. The fact that he was working with his doctor to adjust his medications indicates his willingness to report problems and comply with treatment. It might also be advantageous for Ethan to exercise and form relationships with other juveniles, but the record nowhere indicates that his refusal to do so made him more dangerous to others or a poor candidate for rehabilitation. It would not be unusual for a boy to take some additional time to adjust to adult prison life—especially when the boy is mentally ill.

The district court also noted that Ethan was abusing his antidepressants before the murder and that in jail he was receiving injections of antipsychotics, which necessarily involves direct supervision from medical professionals, rather than a more informal form of treatment. Again, however, nothing in the record suggests that Ethan's drug abuse before the murder was anything other than a product of his mental illness. Further, as the State admitted at oral argument, the fact that Ethan's drugs were injected did not reflect at all on his willingness to comply with treatment. The district court wrongly inverted the burden of proof by finding that Ethan had not yet shown that he could comply with treatment because he was receiving injections rather than other types of medication.

I am thoroughly confident that life sentence with a lengthy fixed term is necessary here, but at some point Ethan deserves the chance to demonstrate to the parole board that he is fit to rejoin society. If Ethan proves to be incorrigible or noncompliant with treatment, the State

should certainly confine him for the rest of his life. However, due to the fact that Ethan is likely a good candidate for rehabilitation, he should receive a meaningful opportunity to someday demonstrate to the parole board that he can be safely released. *Cf. Graham*, --- U.S. ---, 130 S. Ct. at 2034 (requiring all non-homicide juvenile offenders to be given a "realistic opportunity to obtain release" before the end of a life term).

The Majority states, without reasoning or authority, that courts need not take into account the possibility that the parole board could later more accurately evaluate whether an offender should be released. It simply contends that the "Legislature has conferred the power and responsibility to impose determinate sentences upon the judiciary." The Majority omits the fact that the Legislature also equipped the parole board to evaluate offenders throughout their time in prison. The Idaho Constitution empowered the state board of correction to release and oversee offenders on parole. *See* Idaho Const. art. X, § 5 (empowering the board to manage adults on parole); *see also* I.C. § 20-219 (allowing the board to grant parole and requiring it to supervise parolees). State law thereby entrusts the board with the important task of determining "what is best for society and the rehabilitation of the parolee." *Heath v. State*, 94 Idaho 101, 104, 482 P.2d 76, 79 (1971). The state board of correction may grant parole, but only after evaluating the offender's personal circumstances, which specifically includes medical and psychological information. I.C. § 20-219, -223(c). The parole commission will be able to better assess Ethan in his adulthood after decades of observation and medical treatment than the district court could when it sentenced him as a teenager. This Court should have confidence that the parole board will carefully consider these factors and arrive at a proper conclusion in Ethan's case.

Further, sentencing Ethan as if there were no mechanism for later determining whether he is safe to release back into society permits courts to impose unnecessarily harsh sentences. The Court's holding therefore magnifies the district court's error by assuming that the district court may resolve uncertainties about the distant future against Ethan.

**B.     The District Court Abused Its Discretion when it Punished Ethan, a Child with a Mental Disorder, with a Full Adult Sentence**

I do not quarrel with the Majority when it asserts that a crime can merit the maximum penalty simply based on its egregious nature. I cannot however agree with the Majority's unprecedented holding that the offender's individual characteristics are no longer relevant to determining the reprehensibility of a crime. I also cannot see how the district court exercised

- 16 -

any reason in finding that Ethan's offense was egregious enough to merit the maximum prison sentence available to punish a mentally sound adult.

        1.        *An Offender's Characteristics Are Relevant to the Reprehensibility of a Crime*

The Majority creates a startling new point of law, stating, "The considerations of societal retribution and general deterrence are not decided on the basis of the unique characteristics of the *offender*; rather these considerations are decided upon the characteristics of the *offense*" (emphasis in original). The Court cites only a nonbinding Court of Appeals case, *State v. Eubank*, for the proposition that retribution and deterrence are considerations "based on the nature of the offense," a statement for which the Court of Appeals itself cited no legal authority. 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct. App. 1988). Because the district court did not mention general deterrence in its sentencing ruling from the bench, I will focus only on whether an offender's individual characteristics are relevant to retributive considerations in sentencing.

The Majority's new retributive approach is a direct departure from basic concepts about retribution, as it is a well-entrenched feature of American law that moral culpability varies with each individual offender. "The severity of the appropriate punishment necessarily depends on the culpability of the offender." *Atkins v. Virginia*, 536 U.S. 304, 319, 122 S. Ct. 2242, 2251 (2002); *see also Tison v. Arizona*, 481 U.S. 137, 149, 107 S. Ct. 1676, 1683 (1987) ("The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender."). "Not every offense in a like category calls for an identical punishment. There may properly be a variation in sentences as between different offenders, depending on the circumstances of the individual cases . . . ." *State v. Small*, 107 Idaho 504, 506, 690 P.2d 1336, 1338 (1984). A crime is less reprehensible—and therefore potentially less deserving of severe retribution—if the criminal has personally mitigating circumstances. Even in death-penalty cases, the law requires a jury or judge to weigh aggravating factors against mitigating ones to determine the appropriate sentence. *See State v. Payne*, 146 Idaho 548, 579, 199 P.3d 123, 154 (2008) (citing I.C. § 19-2515, stating that juries "conduct the weighing process of aggravating and mitigating factors to determine if the defendant should be sentenced to death").

Punishing offenders based at least in part on their personal culpability comports with our natural sense of justice. Retributive justice ensures that the defendant "pays" for the crime by getting his or her "just deserts." *See Black's Law Dictionary* 942 (9th ed. 2009) (defining "just

deserts" as "the punishment that a person deserves for having committed a crime"). This necessarily involves not just the reprehensibility of the offense, but also whether the offender has any personal aggravating or mitigating characteristics. *Taggart v. State*, 957 So. 2d 981, 994 (Miss. 2007). For example, a shooting committed by a cognitively mature adult offender merits greater retribution than the same shooting committed by an adult with the cognitive abilities of a five-year-old. That the Majority cites no authority to the contrary further illustrates how ubiquitous this principle is.

Most pertinent to this case is the fact that an offender's youth and an offender's mental capacity are both relevant to how reprehensible a crime is. As explained further below, this has surfaced most notably in capital-punishment jurisprudence, but the principle remains the same in all criminal cases, including determinate-life sentences. *See State v. Hinger*, 600 N.W.2d 542, 548 (S.D. 1999) (stating that the "most severe" sanction of life imprisonment is reserved for "the most serious combinations of the offense and *the background of the offender*" (emphasis added)). The U.S. Supreme Court has held, "Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, by a substantial degree, by reason of youth and immaturity." *Roper v. Simmons*, 543 U.S. 551, 571, 125 S. Ct. 1183, 1196 (2005). The Court has also found that the mentally retarded are simply not capable of committing crimes that deserve the same level of retribution as those committed by fully mentally capable adults. *Atkins*, 536 U.S. at 317–19, 122 S. Ct. at 2242; *see Allen v. Ornoski*, 435 F.3d 946, 952–53 (9th Cir. 2006) ("[T]he Supreme Court's limitations on the use of the death penalty are grounded in the theory that some classes of persons are less culpable and therefore not deserving of the death penalty."); *see also Nelson v. Quarterman*, 472 F.3d 287, 318 (5th Cir. 2006) (same). The Majority errs in ruling otherwise.

    2.     *The District Court Did Not Exercise Reason When It Concluded That Ethan Deserved the Maximum Adult Punishment*

A determinate life sentence for second-degree murder is a harsh one and is the maximum authorized by law even for a healthy adult. I.C. § 18-4004. A maximum sentence should be reserved only for the most blameworthy defendants. This is especially true when imposing a fixed-life sentence. Because fixed-life sentences by their very nature presuppose that rehabilitation is impossible, they can only be justified where the offender's conduct has been so horrific that society's interest in deterrence and retribution must govern the penalty. There are two reasons why Ethan does not deserve the full adult punishment of a fixed-life sentence. First,

he likely would not have committed the offense but for his paranoid schizophrenia, and second, he was a sixteen-year-old boy at the time of the murder. The culpability of a child who commits a crime as a result of mental illness is "twice diminished" over that of a healthy adult. While one of these factors alone might justify a fixed-life sentence, a court should not impose such a sentence on a child who is not acting voluntarily.

> a.   Ethan's culpability is diminished because he was not acting voluntarily but rather as a result of a psychotic disorder

As a general matter, defendants with diminished mental capacity are less blameworthy than people who are cognitively intact. The U.S. Supreme Court, for example, categorically barred the death penalty for mentally retarded individuals because they are less able to "engage in logical reasoning," and to "control impulses." *Id.* at 318, 122 S. Ct. at 2250–51. Even though the defendant's mental condition is not a defense to any crime in Idaho, I.C. § 18-207(1), the defendant's ability to control and appreciate his or her actions is a mitigating factor directly relevant to sentencing. *State v. Strand*, 137 Idaho 457, 461, 50 P.3d 472, 476 (2002). When mental illness is "a significant factor" in a criminal sentence, the district court must consider a number of mitigating facts, including "[t]he extent to which the defendant is mentally ill," "[t]he degree of illness or defect and level of functional impairment," and "[t]he capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law at the time of the offense charged."[4]   *Id.* § 19-2523; *Hollon v. State*, 132 Idaho 573, 581, 976 P.2d 927, 935 (1999). "By requiring the court to consider the defendant's

---

[4] The relevant portion of the statute provides in full:

> (1) Evidence of mental condition shall be received, if offered, at the time of sentencing of any person convicted of a crime. In determining the sentence to be imposed in addition to other criteria provided by law, if the defendant's mental condition is a significant factor, the court shall consider such factors as:
>
> > (a) The extent to which the defendant is mentally ill;
> >
> > (b) The degree of illness or defect and level of functional impairment;
> >
> > (c) The prognosis for improvement or rehabilitation;
> >
> > (d) The availability of treatment and level of care required;
> >
> > (e) Any risk of danger which the defendant may create for the public, if at large, or the absence of such risk;
> >
> > (f) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law at the time of the offense charged.

I.C. § 19-2523(1).

capacity at sentencing, the legislature necessarily required that the court consider the defendant's capacity to appreciate his or her actions separately from the ability to form the requisite intent to commit the offense." *State v. Odiaga*, 125 Idaho 384, 392, 871 P.2d 801, 809 (1994); *see also State v. King*, 120 Idaho 955, 959, 821 P.2d 1010, 1014 (Ct. App. 1991) ("Diminished capacity to act rationally is relevant to the determination of sentence . . . .").

The medical evidence overwhelmingly demonstrates that Ethan killed his mother as a result of a serious mental illness. Ethan stated during his confession that a calling to commit murder had been "growing" inside him for some time prior to the night of the murder. Dr. Craig W. Beaver, a psychologist, and Dr. Michael E. Estess, Ethan's treating psychiatrist in jail, both diagnosed Ethan with paranoid schizophrenia, a disorder that drove Ethan to kill Judith because it had not been properly treated. Dr. Estess wrote, "It was obvious from my first encounter with Ethan that he was acutely psychotic, and had been suffering from an evolving, psychotic, delusional illness, for some time prior to his arrest." Dr. Estess concluded that Ethan's actions were not "voluntary." Dr. Beaver also tentatively diagnosed Ethan with paranoid schizophrenia, stating that "[c]learly, his psychotic disorder and his treatment, or lack thereof . . . was a primary factor" in causing the murder.

Virtually all the available medical evidence indicates that Ethan's bizarre behavior and aggression was a result of a profound psychotic disorder he was suffering before, during, and after the murder. Both doctors found that Ethan "clearly had an evolving psychotic episode going back at least three to four years prior to the incident," and that he underwent a "psychotic break which occurred at and around the time he killed his mother." Both doctors agreed that Ethan's preoccupation with serial killers and violence was directly related to his growing psychotic symptoms. There is no indication that Ethan's offensive actions, remorselessness, and grandiose statements were anything but his psychosis manifesting itself. As Dr. Beaver observed, "There was not any evidence of malingering or significant exaggeration of his psychiatric issues."

Both the district court and the Majority suggest that the medical professionals are not unanimous as to whether Ethan has paranoid schizophrenia. Regardless of what Ethan's precise ailment is, no medical professional has ever indicated that Ethan was mentally sound when he murdered his mother or when he was interviewed by police.

Just as important, as Dr. Estess wrote, the murder "is Ethan's first serious episode of disorganization and response to his intrusive, delusional, psychotic material. I would point out that this young man made very significant efforts to get himself some treatment." According to Craig Windom, Ethan's father, Ethan had previously demanded to see a medical professional to diagnose his problems. Consequently, four months before the murder, Ethan began seeing Dr. Tim Ashaye, a psychiatrist. The district court commented that Dr. Ashaye's records do not show that Ethan was exhibiting homicidal ideations or other symptoms of psychopathy. The fact that Dr. Ashaye only spent short periods of time with Ethan likely explains the misdiagnosis.[5]

Dr. Ashaye, for whatever reason, misdiagnosed Ethan with depression and anxiety and prescribed drugs to treat those illnesses rather than drugs for psychosis. Dr. Beaver and Dr. Estess each stated that the anti-anxiety medication was likely "disinhibiting" to Ethan, potentially exacerbating his illness by making it more difficult to resist homicidal impulses. Both also opined that Ethan's over-the-counter creatine supplements might have inadvertently made him more aggressive.

Ethan continued to seek relief for his mental illness by visiting with a social worker, Andrew Layman. Ethan repeatedly described his compulsive homicidal thoughts to Layman, who just one week before the murder began to suspect that Ethan was psychotic. Ethan also encouraged his stepmother to ask Dr. Ashaye to increase his medications and even suggested to various family members that he be committed to a psychiatric facility. Ethan later demanded a brain scan, which revealed that a childhood injury had caused significant organic brain damage to Ethan's right temporal lobe, an area of the brain that is, according to the psychiatrist who performed the scan, "primary in emotional expression and control."

Ethan even reported his homicidal thoughts to authority figures. According to records from Borah High School, Ethan's psychology teacher referred Ethan to school administrators when he openly told his class that he had "thoughts of committing violent crimes against others and it [was] really scaring him that somehow he may lose control and seriously hurt someone." Ethan then told both a school nurse and a school counselor about his homicidal thoughts. The month before the murder, Ethan was arrested for battery when he punched a classmate for taking

---

[5] Ethan told police immediately after his arrest that Dr. Ashaye only spent a "few minutes" with him at a time and "never asked about his homicidal thoughts, feelings, or impulses."

his seat—yet he even told the arresting police officer that he was having homicidal thoughts "and that his meds were not working properly."[6]

In short, the crime that Ethan committed was the direct result of his mental disorder. The record is full of evidence that Ethan attempted to address his growing psychotic illness. It is difficult to imagine what more a sixteen-year-old boy with palpable psychotic symptoms could do about his own mental disorder. The district court unreasonably focused on the erratic behavior Ethan exhibited before and immediately after the murder and ignored the compelling evidence that his actions were not voluntary.

          b.     Ethan was sixteen years old at the time of the offense and was therefore not as culpable as an adult

Compounding Ethan's psychotic impulses was the fact that he was still just a child. Courts broadly agree that adolescents are by and large less mature and responsible than adults. *Thompson v. Oklahoma*, 487 U.S. 815, 834, 108 S. Ct. 2687, 2698 (1988) (plurality opinion); *see also State v. Harris*, 127 Idaho 376, 382, 900 P.2d 1387, 1393 (Ct. App. 1995) (holding that age is a sentencing factor and noting the defendant's "age and impulsiveness" in evaluating a criminal sentence). "Even the *normal* 16-year-old lacks the maturity of an adult." *Eddings v. Oklahoma*, 455 U.S. 104, 116, 102 S. Ct. 869, 877 (1982) (emphasis added). The U.S. Supreme Court recently stated that "because juveniles have lessened culpability they are less deserving of the most severe punishments." *Graham*, --- U.S. ---, 130 S. Ct. at 2026. It relied on psychiatric research demonstrating that adolescents are more impulsive than adults because they "are less able, on average, than adults to self-regulate, or 'cognitively' control, their behavior." Brief of the American Medical Ass'n and the American Academy of Child & Adolescent Psychiatry as Amici Curiae Supporting Neither Party at 6, *Graham*, --- U.S. ---, 130 S. Ct. 2011 (2010) (Nos. 08-7412, 08-7621), 2009 WL 2247127 (cited in *Graham*). This immaturity often causes children to make "impetuous and ill-considered actions and decisions." *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 2669 (1993).

The U.S. Supreme Court's views align with the consensus emerging in the scholarly literature that adolescents are not as able as adults to act responsibly. Psychiatrists and neuroscientists observe that most children develop adult-like abilities to exercise logic and reason by the time they are fourteen or fifteen years old. Praveen Kambam & Christopher

---

[6] This charge for battery, just one month before the murder, was the first time Ethan had ever been arrested.

Thompson, *The Development of Decision-Making Capacities in Children and Adolescents: Psychological and Neurological Perspectives and Their Implications for Juvenile Defendants*, 27 Behav. Sci. & L. 173, 175 (2009). Their ability to think logically deteriorates, however, in emotionally charged or stressful situations. Jay D. Aronson, *Neuroscience and Juvenile Justice*, 42 Akron L. Rev. 917, 921–22 (2009). Further, "[e]ven though adolescents, by age sixteen, exhibit intellectual abilities comparable with adults, they do not develop the psycho-social maturity, ability to exercise self-control, and competence to make adult-quality choices until their early-twenties." Barry C. Feld, *Unmitigated Punishment: Adolescent Criminal Responsibility and LWOP Sentences*, 10 J.L. & Fam. Stud. 11, 50 (2007). These scientific observations articulate what we already know from everyday life. Teenagers, including Ethan, generally understand the difference between right and wrong—it is their ability to modulate their behavior that diminishes their culpability.[7]

These basic facts about child behavior further illustrate why the district court abused its discretion. Both the district court and the Majority recite a long list of statements Ethan made before the murder regarding his fascination with violence and statements he made after the murder indicating he understood that he had murdered his mother. They nowhere account for the fact that most juveniles Ethan's age have the cognitive ability to comprehend their behavior, but lack the neurological maturity and knowledge gained from life experiences to control it.

       c.     When taken together, Ethan's youth and mental illness combine to make a fixed-life sentence an inappropriate punishment

In *Graham*, the U.S. Supreme Court ruled out fixed-life sentences for children who have committed non-capital offenses, reasoning that "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." --- U.S. ---, 130 S. Ct. at 2027. It follows that a juvenile offender, regardless of the crime, also has "twice diminished moral culpability" if he or she acted involuntarily due to mental illness.

The juvenile's natural inability to hold out against impulses becomes especially important when a profound mental disorder compels him or her to act violently. *Cf. Eddings*, 455 U.S. at 115, 102 S. Ct. at 877 ("[W]hen the defendant was 16 years old at the time of the offense there can be no doubt that evidence of . . . severe emotional disturbance is particularly relevant."). A

---

[7] *See also* Stephen J. Morse, *Immaturity and Irresponsibility*, 88 J. Crim. L. & Criminology 15, 52–53 (1997) (concluding, after a review of the scholarly literature, that adolescents have mature formal-reasoning abilities, but are less able to assess risk, are impulsive, and have a less developed sense of time passage than adults).

child, already lacking a developed capacity to defy impulses, is likely more susceptible to involuntary psychotic compulsion to act violently.

In this case, Ethan was a sixteen-year-old boy suffering from persistent psychotic homicidal impulses. This drastically undermines his personal culpability and should make him ineligible for the most severe punishment available for a second-degree murder. Moreover, the penalty for second-degree murder ranges from ten years to life imprisonment. This could mean a sentence of sixty years or more, making a life sentence a much more onerous penalty for a child than an adult who can expect to spend fewer days in prison during his or her natural life. *See Roper*, 543 U.S. at 572, 125 S. Ct. at 1196 ("[T]he punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person."). This Court must somewhere draw the outer boundaries of the district courts' sentencing authority to ensure that, in the future, even younger mentally ill children are not sent to prison forever for behavior outside of their conscious control.

The Majority states that two of the legal opinions cited in this Dissent, *Graham* and *Roper*, are not applicable here because they are Eighth Amendment decisions. *Graham*, --- U.S. at ---, 130 S. Ct. at 2020; *Roper*, 543 U.S. at 559–60, 125 S. Ct. at 1189. Ethan, of course, does not raise a constitutional challenge to his sentence on appeal to this Court. Nonetheless, the real-world principles the U.S. Supreme Court relied upon in *Graham* and *Roper*, as well as other rulings, are universal and fully relevant here. By and large, the mentally insane and the young do not conform, and indeed cannot be expected to conform, their behavior to the law to the same extent as a fully developed adult.

It is further true that *Graham* expressly found homicides to be more worthy of severe punishment than noncapital crimes and affirmed that fixed-life sentences are available to punish juveniles who have committed capital crimes. *Graham*, however, did not address a situation at all like Ethan's. There is no indication that the offender in that case suffered from paranoid schizophrenia or a similarly serious psychotic illness.

The Justices in the Majority ultimately admit that they "may well have done as the dissent suggests" and imposed a lighter penalty if they were the sentencing judges, but opine that "[s]entencing is less a science than an art," left to the nearly boundless discretion of the trial court. The Majority justifies its refusal to vacate the district court's sentence by explaining that

"[o]ur standard of review does not require (nor indeed, does it permit) us to conduct our own evaluation of the weight to be given each of the sentencing considerations."

Of course, the district court has wide discretion in imposing a sentence, *State v. Calley*, 140 Idaho 663, 665–66, 99 P.3d 616, 618–19 (2004), but that discretion has to end somewhere. Here that discretion was abused when the district court applied the wrong legal standard to determine whether Ethan could be rehabilitated. Further, even if the sentencing court applies the correct legal standard, this Court overturns sentences that are unreasonable based upon the specific facts of each case. *State v. Sheahan*, 139 Idaho 284, 77 P.3d 956, 973 (2003). Ignoring the individual circumstances underlying each criminal sentence would be no review at all. Idaho's appellate courts have a duty to intervene when someone's personal freedom could be unreasonably withheld, and this includes inquiring into the trial court's factual determinations with regard to the sentencing factors and ensuring that the court applied the correct legal standard. In other words, this Court can and should expect more precision in sentencing than what occurred here.

To summarize, a severe punishment is undoubtedly appropriate in this case, but a fixed-life sentence is the maximum sentence available even for a mentally sound adult who has committed this same crime. Under no reasonable view of the facts should this penalty be imposed on a mentally ill child who would not have committed this crime except for his serious cognitive disorder. No judge can see fifty to sixty years in the future. Even if Ethan did not already show a promising likelihood that he can be rehabilitated, medical science will surely undergo radical progress during his lifetime. Changes in psychological therapy and psychiatric treatment methods could very well render mental illnesses like Ethan's curable. The parole board exists for just this purpose: to monitor and evaluate individual cases so that courts do not have to prophesize an unknowable distant future. The sentence should be vacated and the case remanded for resentencing.